RUTH DOLAN, Adm'r of the Estate of Daniel M. Dolan, Deceased, Plaintiff-Appellant, *v.* LEO F. WELCH, Adm'r of the Estate of Leo v. Welch, Deceased, *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 82—2283

Opinion filed March 30, 1984.

Bradley, Bradley & Nedderman, of Chicago (Thomas F. Nedderman, of counsel), for appellant.

Walter M. Ketchum, Ltd., of Chicago (Jonathan K. Gray, of counsel), for appellees.

PRESIDING JUSTICE RIZZI delivered the opinion of the court:

Plaintiff, Ruth Dolan, administrator of the estate of Daniel M. Dolan, sought a declaratory judgment that an insurance policy issued by defendant Farmers Insurance Group to defendant Leo F. Welch, administrator of the estate of Leo V. Welch, and an insurance policy issued by defendant Mid-Century Insurance Exchange, an affiliate of Farmers, to Leo V. Welch covered a car accident in which Daniel M. Dolan and Leo V. Welch were killed. Following a bench trial, the court found that the policy issued to Leo F. Welch provided no coverage for the accident. Plaintiff appeals. We reverse.

At trial, the evidence showed that on July 5, 1979, Daniel M. Dolan and Leo V. Welch, both 17 years old, were killed in a collision involving a 1964 Corvair driven by Welch in which Dolan was a passenger. The Corvair was purchased on June 30, 1979. Leo V. Welch's parents, Mr. and Mrs. Leo F. Welch, paid $200 of the $400 price of the Corvair and received a bill of sale which Mrs. Welch signed at the request of the seller. The $200 was a loan to Leo V. which he was supposed to repay. Title was going to be registered in the name of Mr. Welch, but Leo V. was to be responsible for maintaining the car. Mrs. Welch testified that she believed the Corvair was her son's car. However, Mr. and Mrs. Welch believed that Leo V. could not legally own a car until he was 18 years old. Mr. and Mrs. Welch claimed the Corvair as a casualty loss on their 1979 income tax return.

Prior to the purchase of the Corvair, in early June 1979, Mr. Welch obtained the title to a 1969 Ford Fairlane which he had purchased about a year earlier. Mr. Welch gave the Fairlane to Leo V. as his car to drive and maintain. Leo V. was supposed to pay his parents for the Fairlane. When Leo V. started driving the Fairlane, either Mrs. Welch or Leo V. called Weldon Brown, the agent who handled the family's insurance, and discussed insurance for the Fairlane. On the insurance application Brown listed Mr. Welch as the registered owner. On the basis of the application, Mid-Century issued a policy dated June 4, 1979, with $10,000 liability coverage, to Leo V.

On June 30, 1979, Brown processed an application for change of insurance on the basis of a phone call from either Mrs. Welch or her son. On this application Brown listed Leo V. as the registered owner. The change consisted of describing the 1964 Corvair as a replacement vehicle for the Fairlane. No member of the Welch family ever signed the application for change, and since the policy was cancelled the same day as the accident, it is possible that a face sheet formally endorsing the change never issued. However, Brown had authority to bind the company, a signature was on the original application and the absence of a formal endorsement would not affect the validity of the application for change.

At the time of the accident, Mr. Welch was the named insured on a Farmer's policy with $100,000 liability coverage. A 1978 Club-Wagon was the described vehicle in that policy. The policy provided for the payment of damages due to bodily injury and property damage "arising out of the ownership, maintenance or use, including loading or unloading, of an automobile" as defined in the policy. The policy defined a "described automobile" as "the automobile described in the Declarations and includes a substitute automobile and/or newly ac-

quired automobile." A "newly acquired automobile" was defined as
"an automobile, ownership of which is acquired by the named
insured, *** (b) if it is an additional automobile and the Com-
pany insures all automobiles owned by the named insured on
the day of such acquisition and the named insured notifies the
Company within thirty days thereafter; but the insurance with
respect to the newly acquired automobile does not apply to any
loss against which the named insured has other collectible in-
surance. The named insured shall pay any additional premium
required."

Plaintiff argues that the Corvair was a newly acquired automobile
within the meaning of the Farmers policy. Specifically, plaintiff main-
tains that the term "ownership" in the newly acquired automobile
provision is ambiguous and must therefore be construed in favor of
the insured. Plaintiff asserts that when "ownership" is so construed,
it is evident that Mr. and Mrs. Welch had an ownership interest in the
Corvair requiring coverage under the newly acquired automobile pro-
vision for additional automobiles. We agree.

■■ ■ A policy provision is ambiguous if, considering the policy as
a whole (see *United States Fire Insurance Co. v. Schnackenberg*
(1981), 88 Ill. 2d 1, 5, 429 N.E.2d 1203, 1205), it is subject to more
than one reasonable interpretation (*State Farm Fire & Casualty Co.
v. Moore* (1981), 103 Ill. App. 3d 250, 256, 430 N.E.2d 641, 646).
Here, the policy defines a newly acquired automobile as an automo-
bile, "ownership of which is acquired by the named insured" as a re-
placement or an additional automobile. "Ownership" is not defined in
the policy. Though we are unaware of an Illinois reviewing court
which has specifically determined that the term "ownership" is am-
biguous in the context of an automobile liability policy, courts of other
jurisdictions have done so. In *American Indemnity Co. v. Davis* (5th
Cir. 1958), 260 F.2d 440, the court determined that the words "an au-
tomobile, ownership of which is acquired by the named insured" com-
prehend both sole and joint ownership since the term "ownership" is
ambiguous. (See also *Quaderer v. Integrity Mutual Insurance Co.*
(1962), 263 Minn. 383, 388, 116 N.W.2d 605, 608.) Further, the clarity
or ambiguity of the term "ownership" will depend on the facts of the
case and the proposed application of the clause in which the term ap-
pears. See *Greenholt v. Inland National Insurance Co.* (1980), 87 Ill.
App. 3d 638, 641, 410 N.E.2d 150, 153.

■■ Under the circumstances here, we believe that there is more
than one reasonable interpretation of "ownership" and therefore
more than one reasonable interpretation of the newly acquired auto-

mobile provision. It is reasonable to interpret "ownership" so as to conclude that Mr. Welch acquired ownership of the Corvair, since Mr. and Mrs. Welch paid part of the purchase price of the Corvair, Mrs. Welch signed the bill of sale, title was going to be registered in the name of Mr. Welch, and Mr. and Mrs. Welch claimed the Corvair as a casualty loss on their 1979 income tax return. However, it is also reasonable to interpret "ownership" so as to conclude that Leo V. acquired ownership of the Corvair since he was to be responsible for maintaining the car, he paid part of the purchase price and the remainder of the purchase price was a loan from his parents which he was supposed to repay. Further, it is reasonable to interpret "ownership" so as to conclude that ownership of the Corvair was not acquired solely by Mr. Welch or solely by Leo V. Rather, under the circumstances, they might have acquired joint ownership of the Corvair. Thus, we believe that in the Farmers policy the term "ownership" is ambiguous. We must therefore construe the term "ownership" in favor of coverage and against the insurer who drafted the policy. (See *United States Fire Insurance Co. v. Schnackenberg* (1981), 88 Ill. 2d 1, 4, 429 N.E.2d 1203, 1205.) Given such a construction, it is plain that Mr. Welch acquired ownership of the Corvair within the meaning of the Farmers policy. Defendants do not dispute that Mr. Welch met the other prerequisites to coverage of the Corvair as a newly acquired automobile. Therefore, we conclude that the Corvair was covered under the Farmers policy as a newly acquired automobile.

Defendants argue that if Mr. Welch did own the Corvair, the Corvair ceased to be a newly acquired automobile within the meaning of the Farmers policy when Leo V. purchased his own insurance for the Corvair. We disagree.

■ With regard to additional automobiles, Mr. Welch's Farmers policy provides that "the insurance with respect to the newly acquired automobile does not apply to any loss against which the named insured has other collectible insurance." Plainly, this limitation does not apply under the circumstances here, since it was for Leo V., not for the named insured, Mr. Welch, that the change of insurance was obtained. Thus, any other collectible insurance was that of Leo V. on the policy which had previously described the Fairlane. We believe that this case is distinguishable from *Cook v. Suburban Casualty Co.* (1964), 54 Ill. App. 2d 190, 203 N.E.2d 748, the case on which defendants rely. In *Cook*, the insured acquired a new auto, notified the insurance agent and had the described auto changed on one policy, then sought coverage under a policy with higher limits which he had on a second auto. Furthermore, the *Cook* court recognized that a newly ac-

quired automobile clause is intended to extend coverage to the insured on a newly acquired automobile for the specified period of time "unless *the insured* purchases specific insurance to cover the newly acquired automobile." (Emphasis added.) (54 Ill. App. 2d 190, 195, 203 N.E.2d 748, 751.) Finally, we believe that defendant Farmers is bound by the express terms of the policy with regard to other collectible insurance notwithstanding the Welchs' intention that Leo V. obtain insurance for the Corvair or that the Corvair not be covered under the Farmers policy. (See *Central National Insurance Co. v. LeMars Mutual Insurance Co.* (S.D. Iowa 1968), 294 F. Supp. 1396, 1401.) Thus, we conclude that the change of insurance for Leo V. describing the Corvair did not affect the coverage of the Corvair as a newly acquired automobile within the meaning of Mr. Welch's Farmers policy.

Accordingly, the judgment of the trial court is reversed.

Reversed.

McGILLICUDDY and WHITE, JJ., concur.